## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA and AMERICAN FINANCIAL & AUTOMOTIVE SERVICES, INC.,<br><br>       Plaintiffs,<br><br>    v.<br><br>JOHN ABSHER,<br><br>       Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Civil Action No. |

## COMPLAINT

Plaintiffs American Bankers Insurance Company of Florida ("ABIC") and American Financial & Automotive Services, Inc. ("AFAS") (ABIC and AFAS are referred to herein collectively as "the Company") allege as follows in support of their Complaint against Defendant John Absher ("Absher") (collectively, Absher, ABIC, and AFAS are referred to as the "Parties"):

## INTRODUCTION

1.      This is an action by the Company[1] against its former consultant, Absher, for breach of contract, violation of the Georgia Trade Secrets Act, fraud, preliminary

---

[1] ABIC and AFAS do business under the trade name, "Assurant."

and permanent injunctive relief, attorney's fees, and punitive damages arising from Absher's theft of ABIC's confidential and trade secret information.

2.      In May 2020, an ABIC affiliate acquired AFAS, where Absher was employed as a Regional Manager with responsibility for selling its gap insurance, extended warranty, and related reinsurance products to car dealerships in the Southeast.  As a condition of his employment, Absher executed a Confidentiality and Non-Competition Agreement ("Confidentiality Agreement") containing post-employment confidentiality and customer non-solicitation covenants prohibiting him from, among other things, using or disclosing the Company's or its clients' confidential and trade secret information.

3.      The Company terminated Absher's employment in March 2023 for misconduct, but, in recognition of his service to the Company (and its predecessor), it engaged Absher as a consultant to support the Company's dealer services business for one additional year pursuant to a written Consulting Agreement, which also contained confidentiality and trade secret protections.

4.      Approximately one month before Absher's Consulting Agreement was set to expire on March 1, 2024, the Company informed Absher that his contract would not be renewed.  In response, between February 7 and February 23, 2024, Absher, through subterfuge, requested, obtained, and misappropriated confidential information and trade secrets belonging to the Company and its automotive dealer

clients—information he subsequently used for his own personal use and/or to solicit the Company's clients on behalf of at least one of the Company's competitors. For example, Absher sent more than 70 documents containing highly sensitive financial information regarding approximately 29 of the Company's dealer clients to a Gmail account. Absher also sent highly confidential sales information and a customer e-mail contact list to the same Gmail account.

5.      Since the termination of the Parties' business relationship, Absher has, upon information and belief, used the Company's confidential and trade secret information to divert no less than six of the Company's dealer clients away from the Company and to its competitor. Absher's conduct has caused the Company significant monetary damages and constitutes a breach of contract, a violation the Georgia Trade Secrets Act, and fraud.

6.      Accordingly, the Company brings this action to recover compensatory damages, punitive damages, attorneys' fees and costs, and to obtain preliminary and permanent injunctive relief against Absher.

## **PARTIES**

7.      Plaintiffs are part of an insurance company that, among other things, does business through a business unit called Assurant Dealer Services ("ADS"), which provides finance and insurance products, solutions, and support to automotive dealerships.

8. Plaintiff ABIC is a corporation organized under the laws of Florida, with its principal place of business in Florida, located at 11222 Quail Roost Drive, Miami, Florida 33157.

9. Plaintiff AFAS is a corporation organized under the laws of Texas ,with its principal place of business in Texas, located at 1790 Hughes Landing Boulevard, Suite 700, The Woodlands, Texas 77380.

10. Upon information and belief, Absher is a resident of Cherokee County, Georgia, and he may be personally served at 322 Falls Court, Woodstock, GA 30188.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction given that the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states (Florida and Georgia). 28 U.S.C. S 1332(a).

12. Absher is subject to the personal jurisdiction of this Court because he resides within the State of Georgia. Absher is also subject to the personal jurisdiction of this Court because he consented by virtue of executing the Consulting Agreement, which forms the basis of Count II for Breach of Contract. (Ex. C ¶ 10.)

13. Venue is proper in this Court because Absher is a resident of Georgia, and his tortious conduct, as alleged herein, was committed against the Company (in part or in full) in this judicial district. 28 U.S.C. § 1391(b). Venue is also proper in this Court because the Consulting Agreement provides that any claim or controversy

arising out of such agreement shall be brought in this Court. (Ex. C ¶ 10.)

## FACTUAL BACKGROUND

### The Company's Automotive Reinsurance Products and Services

14.    ABIC and AFAS are part of a family of insurance companies that do business under the trade name "Assurant."

15.    The Company offers a variety of insurance products and services to its customers across the United States, including, for example, vehicle insurance products for the automotive industry.

16.    Relevant here, the Company provides insurance products to new and used car dealerships, which allow the dealers to offer pre-paid maintenance, gap insurance (insurance that pays off a consumer's auto loan if the vehicle is lost, stolen, or totaled), and extended warranty services (covering everything from flat tires to dings and scratches to major body work), among other things, to their customers.

17.    The reinsurance products the Company offers not only allow dealers to provide their customers with additional protections for their vehicles, but they also serve as a potential profit center for the dealers, as the premiums customers pay for the various reinsurance products are held in reserve by the dealer's captive reinsurance company, which the Company assists the dealers in establishing. This structure provides a beneficial tax vehicle for the dealer to build additional assets

from premium payments, which can be invested, with unused premiums building equity for the dealer.

18.     The insurance and reinsurance market is highly competitive, and companies like ABIC and AFAS compete fiercely for auto dealers' business, from which they derive administrative fees in exchange for assisting the dealer with establishing captive small property and casualty insurance companies (which hold the premiums in trust) and training the dealer's finance and insurance personnel to drive revenue through sales of the reinsurance products.

19.     The Company's administrative fees, dealer financial information, and sales strategies are highly confidential, and are subject to significant efforts by the Company to maintain their secrecy.  For example, information about the Company's administrative fees and dealer financial information is only available to a handful of ADS employees and is maintained in a password-protected database.  ADS sales employees and consultants, like Absher, do not have access to this information, except upon request for legitimate business reasons, and they execute confidentiality agreements requiring them to keep the Company's above-described information confidential.

### Absher's Employment with ABIC and Employment Agreement

20.     In May 2020, ABIC acquired AFAS, Absher's employer at the time.  As a result of the acquisition, ABIC became Absher's employer in January 2021, but

Absher continued to perform services on behalf of AFAS, ABIC's affiliate, as an ADS employee.

21.     During his employment with the Company, Absher held the position of Regional Sales Manager of ADS, which required him to sell the Company's reinsurance products directly to its automotive dealer clients in the Southeast.

22.     As a condition of his employment, Absher entered into Confidentiality Agreement with AFAS in September 2021. A true and correct copy of the relevant portions of the Confidentiality Agreement cited herein is attached hereto as **Exhibit A**.

23.     The Confidentiality Agreement defines "Confidential Information" as:

> An item of information, or a compilation of information, in any form (tangible or intangible), related to the business of Employer that Employer has not made public or authorized public disclosure of, and that is not generally known to the public through proper means.

(Ex. A ¶ 1.)

24.     The Confidentiality Agreement provides examples of "Confidential Information," including "[b]usiness plans, strategic initiatives, competitive analysis, sales optimization information, marketing plans, corporate development, and financial forecasts," as well as trade secrets. (*Id.*)

25.     The Confidentiality Agreement goes on to state:

> Employee shall not knowingly reveal, disclose or make known to any person . . . or use for Employee's own or another's account or benefit, any such Confidential Information[.] . . . Employee represents and warrants that

Employee will only reveal or disclose such Confidential Information as required by law or as necessary in the performance of Employee's duties on behalf of Employer. Employee warrants and represents Employee will not use, for Employee's own or another's account or benefit, any such Confidential Information, whether or not developed, devised, or otherwise created in whole or in part by the efforts of Employee.

(*Id.*)

26. Moreover, the Confidentiality Agreement contains a "Customer Restriction" provision, which states Absher shall not:

directly or through others, working alone or in conjunction with one or more other persons or entities, for compensation or not: (a) solicit, assist in soliciting, facilitate the solicitation of, provide, or offer to provide services to (i) any and all customers of [Plaintiff] as to which [Defendant] had contact, provided services or received Confidential Information about . . . ("Covered Customer") . . . or (b) induce or attempt to induce, on behalf of a Competing Business, any Covered Customer to withdraw, curtail or cancel its business with [Plaintiff] or in any other manner modify or fail to enter into any actual or potential business relationship with [Plaintiff].

(*Id.* ¶ 6.)

27. The Confidentiality Agreement includes an "Attorney's Fees" provision, by which Absher agreed to pay the Company's attorney's fees or costs if a court determines that Absher breached or threatened to breach the Confidentiality Agreement. (*Id.* ¶ 12.)

28. All the Company's ADS employees are subject to similar confidentiality agreements, whereby they are bound to keep any confidential business, financial, pricing, and proprietary information of the Company or its clients (including trade secrets) confidential and to use such information only for the

Company's legitimate business purposes.

## The Company Terminates Absher's Employment and Engages Him as a Consultant

29.     In June 2022, the Company received a report that Absher had made inappropriate and offensive comments during a team meeting.

30.     During the Company's investigation into that report, the Company interviewed Absher, and Absher denied having made the inappropriate and offensive comments.

31.     The Company later determined that Absher had not been truthful in his account of the events.

32.     As a result, the Company chose to terminate Absher's employment, as memorialized in a Memorandum of Understanding ("MOU").  A true and correct copy of the MOU is attached hereto as **Exhibit B**.

33.     The MOU states that, as of September 1, 2022, Absher would no longer supervise employees or otherwise hold the ADS Regional Manager position.  Rather, as of that date, ABIC would engage Absher in an individual contributor role.  (Ex. B ¶¶ 1–4.)

34.     The MOU also provides that Absher's employment with ABIC would terminate on March 1, 2023, at which time Absher could continue providing services to the Company for one year as a consultant, pursuant to the terms of a Consulting Agreement.  (*Id.* ¶¶ 1, 5.)  A true and correct copy of the Consulting Agreement is

attached hereto as **Exhibit C**.

35.     The MOU expressly provides that the Confidentiality Agreement remains in effect and clarifies that "paragraphs 4–7 of the [Confidentiality] Agreement, which have a one-year post employment term, will end at the conclusion of the consulting relationship on March 1, 2024."  (Ex. B ¶ 6.)  The referenced paragraphs include the Customer Restriction provision.  (Ex. A ¶ 6.)

36.     The Consulting Agreement became effective on March 2, 2023, and remained in effect until March 1, 2024.  (Ex. C ¶ 1.)

37.     The Consulting Agreement defines "Confidential Information" as:

> Assurant's and its affiliates' data, information and documentation (whether in tangible or intangible form – including but not limited to Confidential Information memorialized by Consultant), which is valuable to Assurant and its affiliates not generally known to the public or its competitors, including but not limited to: (1) Financial information, including but not limited to earnings, profitability, assets, debts, prices, fee structures, expenses, volumes of purchases or sales, or other financial data, whether relating to Assurant or its affiliates generally, or to particular products, services, geographic areas, or time periods; . . . (3) Marketing or sales information, including but not limited to details about ongoing or proposed marketing or sales plans, programs, or agreements by or on behalf of Assurant or its affiliates; execution of marketing or sales plans; production plans, strategies, reviews, and results; marketing or sales forecasts, strategies, tactics, reviews, analyses, and results; marketing or sales tools, resources, action plans, and models; marketing or sales training programs, strategies, and tactics; lead generation, strategies, schedules, management, and results; marketing- or sales-related analyses; and information about pending or completed transactions; (4) Customer or client and prospective customer and client (whose business Assurant has actively pursued or is actively pursuing (hereinafter "customer" information[))], including sales or service information; pricing models and information for customers; compilations of existing customers; customer needs, preferences, and requirements; customer proposals or agreements; status of customer

accounts or credit; customer service quality processes and issues; related information about customers; and such information about potential customers; (5) business plans and strategies, business models, brand development, acquisition-related information, business partner-related information, product and service plans and development, outsourcing plans and strategies, sales forecasts and strategies, and similar business information[.]

(*Id.* ¶ 6.)

38.     The Consulting Agreement defines "Trade Secrets" as "Confidential Information that meets the requirements of applicable trade secret law." (*Id.*)

39.     The Consulting Agreement also contains a "Nondisclosure of Trade Secrets and Confidential Information" provision (hereinafter, the "Nondisclosure Provision"), which survives the Consulting Agreement's termination and governs Absher's use and disclosure of Confidential Information and Trade Secrets. (*Id.* 7.)

40.     Specifically, the Nondisclosure Provision provides:

The parties acknowledge that during the term of this Agreement, Assurant may make available to Consultant certain of its Confidential Information and Trade Secrets to enable Consultant to provide services under this Agreement. During the term of this Agreement, Consultant agrees to use such Confidential Information and Trade Secrets solely for Assurant's benefit, and that Consultant will not disclose, furnish, transmit, send, or disseminate Confidential Information and Trade Secrets to any person or entity other than those within Assurant authorized to receive such information. Consultant agrees that it will not, so long as the pertinent information or documentation remain Trade Secrets, otherwise directly or indirectly use, disclose, furnish, transmit, send, or disseminate to any other person, organization, or entity, or otherwise employ, any Trade Secrets. Consultant further agrees that it will not, during the term of this Agreement and for two (2) years after the termination of this Agreement (whether voluntarily or involuntarily, with or without cause or prior notice), otherwise directly or indirectly use, disclose, furnish, transmit, send, or disseminate to any other person organization or entity, or otherwise employ, any Confidential Information. . . .

Consultant acknowledges that Assurant has received and in the future will receive from third parties their confidential proprietary information and trade secrets subject to a duty on Assurant's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Consultant agrees to hold all such confidential proprietary information and trade secrets in the strictest confidence and not to disclose it or use it except as necessary to provide services under this Agreement and consistent with Assurant, Inc.'s agreement with such third party.

(*Id.*)

41.     At no point during the term of the MOU or Consulting Agreement did ABIC ever inform Absher or otherwise state that it would extend the terms of the Consulting Agreement or otherwise allow Absher to continue working for ABIC as a consultant after March 1, 2024.

42.     In fact, upon information and belief, Absher was aware as early as January 2024 that ABIC would not be renewing the Consulting Agreement and that the parties' relationship would expire on March 1, 2024. Upon information and belief, Absher began soliciting the Company's clients to switch their business in favor of a competitor prior to March 1, 2024.

43.     On February 9, 2024, ABIC's Senior Vice President of ADS, Jeff Strickland, took Absher to lunch to inform him that Absher would no longer continue in his role as a consultant after the Consulting Agreement expired on March 1, 2024. During that lunch, Mr. Strickland reviewed the Consulting Agreement with Absher, and they discussed and addressed Absher's obligations under the Nondisclosure Provision.

44. Absher's last day performing services for the Company was March 1, 2024.

### Absher Misappropriates Confidential and Trade Secret Information and Uses It to Solicit the Company's Clients

45. By virtue of his role and duties as a consultant for the Company, Absher had, upon request and for legitimate business reasons, access to certain confidential information and trade secrets of the Company (including proprietary sales information and highly confidential financial information regarding its dealer clients).

46. As described more fully below, between February 7, 2024 and February 23, 2024, Absher, through misrepresentations to his ADS co-workers, obtained approximately 70 documents containing sensitive, non-public financial information regarding ABIC clients, client contact information, and competitively valuable trade secret information regarding the Company's business.

47. Absher sent these documents to a Gmail account, mailbox3441@gmail.com (the "Gmail Account"), unaffiliated with the Company in 28 separate e-mails, violating ABIC's Acceptable Use of Information Assets policy, the Employment Agreement, the Consulting Agreement, and the Company's specific written instructions not to send Company information personal or non-Company e-mail addresses.

48. Upon information and belief, prior to February 7, 2024, Absher had not

used the Gmail Account to take the Company's confidential or trade secret information pertaining to the Company or its clients; it was only after learning that his contract would not be renewed that he began purloining the Company's and its clients' confidential and trade secret information.

49.    As discussed below, among other confidential business information, the emails and attachments Absher sent to the Gmail Account primarily consisted of three types of information: (1) cession statements and related financial information belonging to various ABIC clients; (2) a highly confidential sales script created and developed by ABIC that would provide competitors a blueprint for undercutting ABIC in the marketplace; and (3) a list of e-mail contact information for ABIC's dealer clients.

50.    The emails and attachments Absher sent to the Gmail Account concerned and/or implicated approximately 29 different dealer clients of the Company.

51.    Of those 29 dealer clients, six have terminated their business relationships with ABIC and, as a result of Absher's solicitation efforts, transferred their business to a competitor, National Auto Care ("NAC"), damaging the Company.

52.    Upon information and belief, Absher used the confidential information and trade secrets of the Company and its clients to solicit the six dealer clients who

transferred their business (and likely more) either during the term of the Consulting Agreement or shortly thereafter, inducing them to transfer their business to NAC or another competitor.

The Cession Statements and Top Sheets

53.　On February 5 and 6, 2024, Absher emailed the Reinsurance Manager and Reinsurance Analyst in ABIC's ADS Reinsurance Department requesting confidential cession statements for 24 dealer clients.　Pursuant to ABIC's Information Security Policy, the information contained in the cession statements is only available to a handful of ADS employees and is maintained in a password-protected database.　ADS sales employees and consultants, like Absher, do not have access to this information, except upon request for legitimate business reasons, and they execute confidentiality agreements requiring to keep the Company's above-described information confidential.

54.　Absher expressly represented that he required the cession statements to use during upcoming meetings with the dealer clients that he would be holding in February.　These statements were false and intended to induce the Company to rely upon them to supply him with the most current financial information for the affected clients.

55.　Cession statements and their accompanying data are highly confidential documents akin to banking statements maintained by the Company that contain

sensitive financial information for each dealer client, including, for example, monthly and year-to-date income derived from reinsurance products, number of claims made, amounts paid on claims, amount of reserves left to pay claims, amount of surplus funds available that the dealer can invest or withdraw from the account (net equity), as well as metrics and data concerning loss ratios.

56.    Cession statements and their top sheets are maintained as confidential client information, as only approximately seven employees in ABIC's Reinsurance Department have direct access to them.  If an ADS employee (or consultant) requires a cession statement, they must reach out to one of those members of the Reinsurance Department to make a request for the information and state their legitimate business need for the information.  Cession statements are only disclosed to ADS employees outside of the Reinsurance Department on a need-to-know basis, and even then, only to certain ADS Division Managers, District Managers, and Regional Managers.

57.    ADS disseminates cession statements directly to each dealer client monthly (whether to the dealer him/herself or another designated contact, such as the CEO or CFO of the dealer's reinsurance company).

58.    In his role as a Regional Sales Manager or consultant, Absher never had direct access to cession statements. Thus, to acquire this information, Absher had to ask an employee in the Reinsurance Department to supply it to him.

59.    As of February 5, 2024, Absher had no legitimate need for the cession

statements he requested as, upon information and belief, he had already begun soliciting certain of the Company's clients to switch their business to a competitor.

60.     Upon information and belief, Absher did not meet with all 24 dealer clients whose cession statements he requested in February to advance ABIC's business interests, despite his representation that he required that information for upcoming meetings.  At most, Absher met with only a few of those dealer clients.

61.     Rather, Absher emailed the cession statements he requested for the 24 dealer clients to the Gmail Account for his own personal benefit.

62.     Upon information and belief, Absher used those cession statements to solicit the Company's dealer clients and to induce at least six of them to transfer their business to NAC for his own personal benefit at the Company's expense.

The Sales Script

63.     On February 22, 2024, Absher sent three emails containing and/or attaching a sales script to the Gmail Account.  The sales script is highly confidential and proprietary intellectual property belonging to ABIC, which ADS employees developed in response to various questions from a potential customer as a blueprint and compilation of information needed to sell its products and services to prospective dealer clients.

64.     More specifically, the sales script is a compilation of ABIC's intellectual property derived from numerous sources within the Company and is

competitively valuable because it is a combination of confidential information regarding, among other things, ABIC's product offerings, premiums and excise taxes, start-up fees, training class costs, investment options for unearned premiums, and the frequency with which ADS performs development services for the dealers. This information is not combined anywhere else and offers a blueprint for a competitor on how to undercut ADS in the market.

65.     The sales script is maintained confidentially pursuant to the Company's Information Security Policy and are subject to protection under confidentiality agreements and other Company policies, as disclosure of the confidential information and trade secrets that make up the sales script could cause commercial or operational harm if disclosed outside of the business. The trade secrets and confidential information that make up the sales script have only been disseminated to a small, select group of ADS salespersons and executives within the Company who are subject to confidentiality agreements, and they are not available to competitors or third parties other than the specific customer who posed the questions answered therein.

66.     The sales script would be valuable to the Company's competitors, and the Company has taken reasonable measures (such as requiring its employees and contractors to execute confidentiality agreements) to ensure it does not become available to its competitors given the confidential information and trade secrets it

contains.

67.    Upon information and belief, Absher misappropriated the sales script so he could use the confidential information it contains to his competitive advantage and solicit ABIC's dealer clients.

<u>List of Customer E-Mail Addresses</u>

68.    On February 20, 2024, Absher forwarded an e-mail containing direct e-mail contact information for dozens of dealer clients to the Gmail Account.

69.    Dealer e-mail addresses are of particular importance to the Company's ADS business because it is extremely difficult to obtain the direct contact information for the individual dealers/owners, who do not typically share their e-mail contact information freely.  Instead, dealers usually have a designated point of contact (such as a general manager or similar person) who will field e-mails on behalf of the dealer.

70.    It can take years to develop a prospective dealer relationship to the point where the dealer is willing to share his or her e-mail address with ADS, and Absher's taking of this information from the Company's e-mail systems would give him (or a competitor) a leg up in contacting and soliciting the impacted dealers' business away from ADS.

71.    Upon information and belief, Absher misappropriated the e-mail addresses so he could use them to his competitive advantage and solicit ABIC's

dealer clients.

**Absher Makes Various Additional Material Misrepresentations**

72.     On February 12, 2024, Absher emailed the Company's Licensing Compliance Supervisor, stating, "I am going to be retiring March 1," and, "I will not need the license going forward as I am retiring from our industry."  In connection with this communication, Absher had requested cancellation of all his insurance licenses *except* for his Georgia and Tennessee licenses.

73.     Importantly, the dealer clients whose contact information and cession statements Absher stole, including the six whom Absher solicited to transfer their business to the Company's direct competitor, NAC, are all located in either Georgia or Tennessee.

74.     On February 26, 2024, Absher emailed the Senior Vice President of ADS, Mr. Strickland, implying that he would be retiring and spending more time with his family.

75.     Absher did not retire, however, as he is continuing to do business with many of the Company's former dealer clients, and some of those clients told the Company that they moved their business to the Company's direct competitor, NAC, after Absher asked them to do so.

76.     On February 26, 2024, Absher emailed two ADS Regional Managers, stating "I will most likely still receive calls and various request [sic] from

Dealerships and I will forward all request [sic] back to you guys going forward."

77.     Rather than forward any clients to the Company, however, Absher has actively solicited them away from the Company, including, for example, by traveling to locations where industry trade shows are held and taking dealer clients with whom he worked at the Company to dinners and similar marketing events.

78.     At least two of the dealer clients who transferred their business from the Company and to Absher have told the Company that Absher approached them about transferring their business to NAC.

79.     Additionally, since March 1, 2024, ABIC has discovered that Absher made additional offensive and inappropriate comments in emails to clients and sent a relative pornographic material using ABIC's servers and email, all in violation of the Company's Code of Business Conduct and Ethics and related policies.   Had ABIC been aware of either or both of these incidents prior to March 1, 2024, it would have promptly terminated the Consulting Agreement.

### COUNT I
**Breach of Contract Against Absher by AFAS (the Confidentiality Agreement)**

80.     The Company repeats, realleges, and incorporates by reference the foregoing paragraphs of this Complaint as if fully restated herein.

81.     AFAS and Absher are parties to the Employment Agreement, which is a valid, binding contract.

82.     AFAS performed its obligations under the Employment Agreement or

was excused from doing so.

83.     Through the conduct alleged herein, including, but not limited to, misappropriating confidential information of the Company, confidential information of the Company's dealer clients, and trade secrets for his personal use and to solicit customers away from the Company, Absher breached the Confidentiality Agreement.

84.     Upon information and belief, Absher solicited clients for his own personal benefit prior to the expiration of the one-year customer non-solicitation provision contained in the Confidentiality Agreement.

85.     As a result of Absher's breach of the Confidentiality Agreement, AFAS has been damaged in an amount to be determined at trial.

86.     Pursuant to the "Attorney's Fees" provision of the Confidentiality Agreement, ABIC is entitled to its attorney's fees and costs in having to bring this lawsuit against Absher.

## COUNT II – BREACH OF CONTRACT
**Breach of Contract Against Absher by ABIC (the Consulting Agreement)**

87.     The Company repeats, realleges, and incorporates by reference the foregoing paragraphs of this Complaint as if fully restated herein.

88.     ABIC and Absher are parties to the Consulting Agreement, which is a valid, binding contract.

89.     ABIC performed its obligations under the Consulting Agreement or

was excused from doing so.

90.     Through the conduct alleged herein, including, but not limited to, misappropriating confidential information of ABIC, confidential information of ABIC's dealer clients, and trade secrets for his personal use and to solicit customers away from ABIC, Absher breached the Consulting Agreement.

91.     As a result of Absher's breach of the Consulting Agreement, ABIC has been damaged in an amount to be determined at trial.

<u>**COUNT III**</u>
**Violation of the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760, *et seq.***
**Against Absher by ABIC and AFAS**

92.     The Company repeats, realleges, and incorporates by reference the foregoing paragraphs of this Complaint as if fully restated herein.

93.     The Company has developed, at great expense, information, technical and nontechnical data, formulas, patterns, compilations, programs, techniques, processes, financial data, financial plans, product plans, and sales strategies and plans which are not commonly known by or available to the public and which derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use, and are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

94.     In this action, the Company's trade secret information consists of, but

is not limited to, certain information in the Company's proprietary sales script that Absher misappropriated for his own personal use and to solicit clients away from the Company, which is a competitively sensitive overview of the Company's reinsurance products and services for the automotive industry and how to sell those products and services effectively in the marketplace.

95.     Absher had access to such trade secret information by virtue of his employment and consulting relationships with the Company and his execution of the Confidentiality Agreement and the Consulting Agreement, wherein Absher agreed to maintain such information in the strictest confidence and not to use such information for his own benefit or the benefit of others and not to disclose such information to third parties.

96.     Absher used "improper means," as defined in O.C.G.A. § 10-1-761(1) to acquire the Company's trade secrets and to disclose and use the Company's trade secrets for the benefit of himself without the Company's express or implied consent.

97.     Absher knew or had reason to know at the time of his improper use or disclosure of the Company's trade secrets that his knowledge of the trade secrets was (i) derived through his utilization of improper means to acquire them, (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or (iii) derived from or through a person who owed a duty to the Company (namely, himself) to maintain its secrecy or limit its use.

98.    As a result of Absher's misappropriation of the Company's trade secrets, the Company has been damaged in an amount to be determined at trial and is entitled to recover compensatory damages, punitive damages, and attorneys' fees and costs.

99.    The Company is also entitled to an injunction against Absher prohibiting his further use or disclosure of the Company's trade secrets. To the extent the foregoing relief in insufficient to compensate the Company and to stop Absher from further improper use and disclosure of the Company's trade secrets, the Company hereby seeks and requests all other remedies available to it under the Georgia Trade Secrets Act, including, but not limited to Absher's payment of royalties to the Company.

## COUNT IV
### Fraud Against Absher by ABIC and AFAS

100.    The Company repeats, realleges, and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

101.    Upon information and belief, Absher knowingly made false and material misrepresentations to the Company when he requested confidential cession statements and top sheets in February 2024 and represented that he needed such confidential information for meetings with the Company's dealer client in the scope of his role as an independent contractor for the Company.

102. Upon information and belief, Absher's stated purpose in obtaining the cession statements was false because he had only a few meetings with the Company's clients in the month of February that could have been within in the scope of his role as an independent contractor.

103. Upon information and belief, when Absher requested the cession statements, he know his representation about his purpose in obtaining the same was false.

104. The Company reasonably and justifiably relied upon Absher's knowingly false and material representations, as it would not have sent him the requested cession statements without his articulation of a legitimate business need.

105. The Company had no reason to believe that Absher would use the cession statements to actively solicit its dealer clients, before or after the expiration of Absher's independent contractor relationship with the Company.

106. As a direct and proximate result of Absher's fraudulent conduct, the Company has suffered, and continues to suffer, damages from its justifiable reliance upon Absher's knowingly false representations in an amount to be determined at trial.

107. Absher's fraudulent conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. Accordingly, pursuant to

O.C.G.A. § 51-12-5.1, the Company is also entitled to an award of punitive damages against Absher in an amount to be determined at trial.

**COUNT V**
**Attorney's Fees Against Absher by ABIC and AFAS**

108.   The Company repeats, realleges, and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if set forth fully herein.

109.   Absher has been stubbornly and vexatiously litigious, has acted in bad faith and has caused the Company unnecessary trouble and expense so as to justify and warrant an award of expenses of litigation to the Company under O.C.G.A. § 13-6-11.

110.   Absher has been stubbornly and vexatiously litigious, has acted in bad faith in the performance of the Employment Agreement and the Consulting Agreement, and has caused the Company unnecessary trouble and expense so as to justify and warrant an award of expenses of litigation to the Company under O.C.G.A. § 13-6-11.

111.   The Company is also independently entitled to recover its attorneys' fees and costs for having to bring this action pursuant to the Confidentiality Agreement.

112.   Accordingly, the Company is entitled to attorneys' fees and costs in an amount to be determined at trial.

## COUNT VI
### Punitive Damages Against Absher by ABIC and AFAS

113.   The Company repeats, realleges, and incorporates by referenced the allegations contained in the foregoing paragraphs of this Complaint is if fully set forth herein.

114.   The clear and convincing evidence will show that Absher's tortious actions, as alleged herein, demonstrate willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

115.   Accordingly, pursuant to O.C.G.A. § 51-12-5.1, the Company is entitled to an award of punitive damages against Absher in an amount to be determined at trial.

## COUNT VII
### Injunctive Relief Against Absher by ABIC and AFAS

116.   The Company repeats, realleges, and incorporates by referenced the allegations contained in the foregoing paragraphs of this Complaint is if fully set forth herein.

117.   Absher's violation of the Confidentiality Agreement and the Consulting Agreement and his misappropriation of the Company's confidential and trade secret information has caused and will cause the Company irreparable and immediate injury, loss, and damage, for which it has no adequate remedy at law.

118. Unless Absher is preliminarily and permanently enjoined and restrained, there is a substantial threat that he will continue to violate the Confidentiality Agreement, the Consulting Agreement, and applicable trade secrets laws, causing further irreparable injury to the Company.

119. There is a substantial likelihood that the Company will prevail on the merits of the dispute given that the confidentiality and other restrictions contained in the Agreements are reasonable and necessary to protect the Copmany's legitimate business interests and they fully comply with the Georgia Restrictive Covenants Act ("GRCA"), O.C.G.A. § 13-8-50, *et seq*.

120. The threatened harm to the Company without an injunction prohibiting Absher from committing further breaches of the Confidentiality Agreement, the Consulting Agreement, and applicable trade secrets laws far outweighs any potential harm to Absher if he is enjoined.

121. Enjoining Absher from further breaching the Confidentiality Agreement, the Consulting Agreement, and applicable trade secrets laws will not be adverse to the public interest. Indeed, when the Georgia legislature enacted the GRCA and the Georgia Trade Secrets Act ("GTSA"), it recognized that the public interest would be served through (1) the enforcement of restrictive covenants like those contained in the Confidentiality Agreement and the Consulting Agreement against former employees like Absher and (2) the protection of trade secrets. *See*

O.C.G.A. § 13-8-50 ("The General Assembly finds that reasonable restrictive covenants contained in employment and commercial contracts serve the legitimate purpose of protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state.")

122. The Company requests that the Court preserve the status quo by entering a preliminary and permanent injunction against Abher to restrain and enjoin him from taking any other action that would violate the restrictive covenants contained in the Confidentiality Agreement and the Consulting Agreement or misappropriating ABIC's trade secrets.

## DEMAND FOR JURY TRIAL

The Company demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, ABIC requests that the Court enter an Order:

     A.    Awarding compensatory damages to ABIC and AFAS in an amount to be determined at the trial of this matter;

     B.    Awarding punitive damages to ABIC and AFAS in an amount to be determined at the trial of this matter;

     C.    Awarding ABIC and AFAS their attorneys' fees and costs, including expert fees;

D.    For preliminary and permanent injunctive relief against Absher barring Absher from further violating the Confidentiality Agreement and Consulting Agreement and further use or disclosure of ABIC's confidential and trade secret information;

E.    Alternatively, ordering Absher to pay ABIC and AFAS royalties for his misappropriation and use of its trade secret information; and

F.    Awarding any such other and further relief as the Court deems proper.

Respectfully submitted, this 2nd day of July, 2024.

s/ *Nathan D. Chapman*
Nathan D. Chapman
Georgia Bar No. 244954
Shawna M. Miller
Georgia Bar No. 202310
KABAT CHAPMAN & OZMER LLP
171 17th Street, NW
Suite 1550
Atlanta, Georgia 30363
Tel: (404) 400-7303
Fax: (404) 400-7333
nchapman@kcozlaw.com
smiller@kcozlaw.com

*Attorneys for Plaintiffs American Bankers Insurance Company of Florida and American Financial & Automotive Services, Inc.*